# United States Court of Appeals
## For the First Circuit

No. 06-1983

UNITED STATES OF AMERICA,

Appellant,

v.

ROBERT MARTIN,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Boudin, Chief Judge,
Selya, Senior Circuit Judge,
and Schwarzer,* Senior District Judge.

Dina Michael Chaitowitz, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellant.
Roger A. Cox, with whom Cox & Cox was on brief, for appellee.

March 21, 2008

_____

*Of the Northern District of California, sitting by designation.

**SELYA**, **Senior Circuit Judge**.  In <u>Gall</u> v. <u>United States</u>, 128 S. Ct. 586 (2007), the Supreme Court shed considerable light on the scope and extent of a district court's discretion under the now-advisory federal sentencing guidelines.  See <u>id.</u> at 598-602.  This appeal represents our first full-fledged application of the teachings of <u>Gall</u>.  At the same time, it also affords us an opportunity to discuss a relatively new phenomenon: the practice indulged in by some district courts, of filing post-judgment, post-appeal sentencing memoranda.

The circumstances are as follows.  Defendant-appellee Robert Martin pleaded guilty to a charge of conspiracy to distribute more than 35 but less than 50 grams of cocaine base (crack cocaine) in violation of 21 U.S.C. § 846.  In the presentence investigation report (PSI Report), the probation office set his base offense level under the federal sentencing guidelines at 30, and adjusted it downward to 27 to take account of his acceptance of responsibility.  See USSG §3E1.1.  The defendant had eight prior convictions, yielding a criminal history score of 14; that placed him in criminal history category VI.  His guideline sentencing range (GSR) was, therefore, 130-162 months.

In this case, that calculation was trumped by the defendant's career offender status.  See USSG §4B1.1; see also <u>United States</u> v. <u>Jimenez</u>, 512 F.3d 1, 8 (1st Cir. 2007) (discussing potential trumping effect of career offender calculation).  That

designation, based on six of his prior convictions, yielded an enhanced GSR of 262-327 months.

At the disposition hearing, the defendant moved for a downward departure or, premised on 18 U.S.C. § 3553(a),[1] a sentence beneath the GSR. Specifically, he asked the court to sentence him to the ten-year statutory minimum. See 21 U.S.C. § 841(b)(1)(B).

In support of so steep a variance, the defendant argued that his criminal history score overrepresented the seriousness of

---

[1]The cited statute directs a sentencing court to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed–
  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B) to afford adequate deterrence to criminal conduct;
  (C) to protect the public from further crimes of the defendant; and
  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for–
  (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .
(5) any pertinent policy statement [in the guidelines] . . .
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

-3-

his previous convictions because several of them were remote in time, one was for a misdemeanor, and others involved mitigating circumstances. He also argued that a variance was warranted because of his difficult childhood; the supportive role of his wife, children, and stepchildren; his newfound religious faith; and his potential for rehabilitation. Finally, he pointed out that a number of his codefendants had received variant, below-the-range sentences.

The government responded that the defendant's family circumstances were commonplace; that his criminal record was a matter of great concern; and that his persistent recidivism reflected scant hope for rehabilitation. Given these realities, the government urged the lower court to impose a sentence of 262 months.

The court adopted the guidelines calculations limned in the PSI Report with one exception: having found that the defendant's criminal history score overstated the seriousness of his felonious past, the court rolled back his criminal history category from VI to V. This downward departure yielded a new career offender sentencing range of 235-293 months. The court then imposed a 144-month incarcerative sentence (a full 91 months below the nadir of the recalculated sentencing range). The court explained:

> I can't justify going down to the minimum-mandatory sentence of ten years but I'm going to impose a sentence of 144 months

which is a 12-year sentence. It's a tremendously tough sentence. It's a tremendously tough sentence for Mr. Martin to have to serve, and I think that the sentence is fully responsive to all the criteria set forth at 18 U.S. Section 3553. It brings home the seriousness of the offense and properly addresses it.

It acts as a deterrent to others who might be tempted to step on the path that Mr. Martin walked down. It responds to the specific circumstances of this case, and I believe that the 144-month sentence does recognize the positive things about Mr. Martin, and I have in mind particularly the close relationship he has with his family who are here today and how important that relationship is. It really makes a difference to me to have people here showing their support for him.

I also believe that Mr. Martin has demonstrated an unusually strong commitment to a law-abiding life and I do believe that when he is released from prison and after he [has] served his very difficult sentence, he will stay on the right path and be the sort of person that he now wants to be.

I also believe that a twelve-year sentence will bring his sentence in line with the sentences that I'm imposing on people who are in equivalent positions to Mr. Martin and I have that in mind as another reason for going outside the guidelines here.

So in summary: The close family relationships, the support of the family, Mr. Martin's own qualities which I think he expressed very well in his statement, and thirdly, to bring the sentence in line with other defendants I'm sentencing in this same very, very destructive drug conspiracy I will impose that sentence.

In its near-contemporaneous written statement of reasons in support of the sentence, see 18 U.S.C. § 3553(c)(2), the court referenced 18 U.S.C. § 3553(a) and stated that it was imposing a below-range sentence "due to the defendant's close family ties and support; the defendant's personal qualities, and to be in line with the sentences being imposed on codefendants in this matter."

The government filed a timely notice of appeal. While that appeal was pending (and almost one year after it pronounced sentence and entered judgment), the district court issued a supplemental memorandum (the Memorandum) that it described as "intended to distill . . . more concisely" the reasoning that underlay the sentence. The Memorandum vouchsafed that the sentence had been based principally on four elements. First, the defendant had "unusually strong" support from his family. Second, his "expressions of remorse were unusually sincere and reliable." Third, there was "an unusually low likelihood of recidivism." Fourth, the defendant "was responsible for a significant but not overwhelming amount of drugs," and the sentence actually imposed was comparable to those imposed on other (similarly situated) coconspirators.

That was the state of the record when this appeal was argued on September 5, 2007. We withheld decision in anticipation that the Supreme Court shortly would revisit the sentencing guidelines and speak authoritatively to the tri-cornered

-6-

relationship among them, the district court's discretion (informed by the section 3553(a) factors), and the sentence actually imposed. That expectation was rewarded in Gall, a decision that warrants some elaboration.

After pleading guilty to a drug-trafficking charge, Gall faced a GSR of 30-37 months. 128 S. Ct. at 592-93. The district court, taking account of several section 3553(a) factors — including age, voluntary withdrawal from the charged conspiracy, familial support, and apparent pre-indictment rehabilitation — eschewed hard time and imposed a probationary sentence. Id. at 593. The court of appeals vacated the judgment, terming the non-incarcerative sentence "unreasonable" and stressing that the sentence comprised a "100% downward variance" from the GSR. Id. at 594 (quoting United States v. Gall, 446 F.3d 884, 889 (8th Cir. 2006)).

The Supreme Court reinstated the sentence. See id. at 598-602. In so doing, the Justices emphasized the broad sweep of a sentencing court's discretion in the wake of the decision in United States v. Booker, 543 U.S. 220, 260-62 (2005), which rendered the federal sentencing guidelines advisory. See Gall, 128 S. Ct. at 594-98.

The Gall Court was careful not to throw out the baby with the bath water. The Court acknowledged that the guidelines deserve some weight in the sentencing calculus, as they are "the product of

careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." Id. at 594. It made clear, though, that courts of appeals must grant district courts wide latitude in making individualized sentencing determinations, thus guarding against the institutionalization of an impermissible presumption that outside-the-range sentences are unreasonable. Id. at 595.

To help navigate the strait between guidance and discretion, the Gall Court laid out a sequence of steps for sentencing courts to follow. A sentencing determination should begin with the calculation of the particular defendant's GSR. As a final step in arriving at a defendant's GSR, the district court must assess the appropriateness vel non of any departures.[2] See United States v. Dixon, 449 F.3d 194, 204 (1st Cir. 2006).

Properly calibrated, the GSR should serve as the sentencing court's "starting point" or "initial benchmark." Gall, 128 S. Ct. at 596. Nevertheless, the guidelines are only advisory, see Booker, 543 U.S. at 262, and the sentencing court may not mechanically assume that the GSR frames the boundaries of a reasonable sentence in every case. See Gall, 128 S. Ct. at 596-97.

---

[2]Departures are distinct from what are interchangeably called variances or deviations, which are superimposed upon the ultimate guidelines calculation. See United States v. Vampire Nation, 451 F.3d 189, 195 & n.2 (3d Cir. 2006).

The sentencing court's next steps should include hearing argument from the parties as to the proper sentence in the particular case, weighing the applicability of the sundry factors delineated in 18 U.S.C. § 3553(a), reaching an ultimate sentencing determination, and explicating that decision on the record. See Gall, 128 S. Ct. at 596-97. This progressive sequence was adumbrated in our post-Booker, pre-Gall jurisprudence. See, e.g., Dixon, 449 F.3d at 203-05; United States v. Jiménez-Beltre, 440 F.3d 514, 518-19 (1st Cir. 2006) (en banc).

This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility. In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall, 128 S. Ct. at 598.

Of course, the fact that a sentencing court possesses the raw power to deviate from the guidelines does not mean that it can (or should) do so casually. The court's reasons for deviation should typically be rooted either in the nature and circumstances

of the offense or the characteristics of the offender; must add up to a plausible rationale; and must justify a variance of the magnitude in question. See, e.g., United States v. Scherrer, 444 F.3d 91, 93 (1st Cir. 2006) (en banc); Jiménez-Beltre, 440 F.3d at 519. Moreover, a certain "sliding scale" effect lurks in the penumbra of modern federal sentencing law; the guidelines are the starting point for the fashioning of an individualized sentence, so a major deviation from them must "be supported by a more significant justification than a minor one." Gall, 128 S. Ct. at 597.

We hasten to add, however, that notwithstanding this need for an increased degree of justification commensurate with an increased degree of variance, there is no stringent mathematical formula that cabins the exercise of the sentencing court's discretion. See id. at 595. Indeed, after Gall the sentencing inquiry — once the court has duly calculated the GSR — ideally is broad, open-ended, and significantly discretionary. United States v. Vega-Santiago, ___ F.3d ___, ___ (1st Cir. 2008) (en banc) [No. 06-1558, slip op. at 7]. At that point, sentencing becomes a judgment call, and a variant sentence may be constructed "based on a complex of factors whose interplay and precise weight cannot even be precisely described." Id. at ___ [slip op. at 5].

Gall also speaks to the principles that inform appellate review of sentencing determinations. A corollary of the broad

-10-

discretion that Gall reposes in the district courts is the respectful deference that appellate courts must accord district courts' fact-intensive sentencing decisions. Thus, the court of appeals must review the sentence actually imposed "under a deferential abuse-of-discretion standard." Gall, 128 S. Ct. at 591. In that endeavor, it must "first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range." Id. at 597.

Once the appellate court has satisfied itself that the sentence is procedurally sound, it must proceed, under the same abuse of discretion rubric, to review the substantive reasonableness of the sentence, taking into account the totality of the circumstances. Id. When the sentence is outside the GSR, the appellate court is obliged to consider the extent of the variance, but even in that posture it "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Id. That is because the sentencing court possesses a number of institutional advantages, including a superior coign of vantage, greater familiarity with the

-11-

individual case, the opportunity to see and hear the principals and the testimony at first hand, and the cumulative experience garnered through the sheer number of district court sentencing proceedings that take place day by day.  Id. at 597-98.

With this preface, we return to the case at hand.  The government makes no claim that the district court committed any procedural error either prior to or in the course of imposing sentence.  Accordingly, our review is limited to the substantive reasonableness of the 144-month sentence actually imposed.[3]  In probing that point, we remain mindful of two abecedarian truths.

First, because we cannot desultorily substitute our judgment for that of the sentencing court, it is not a basis for reversal that we, if sitting as a court of first instance, would have sentenced the defendant differently.  Second, reasonableness is a protean concept, not an absolute.  We think it follows that there is not a single reasonable sentence but, rather, a range of reasonable sentences.  See Dixon, 449 F.3d at 204.  Consequently, reversal will result if — and only if — the sentencing court's ultimate determination falls outside the expansive boundaries of that universe.

---

[3]In challenging the substantive reasonableness of the sentence actually imposed, the government abjures any targeted objection to the specificity of the court's contemporaneous explanation for that sentence.  Any such objection is, therefore, waived.  See United States v. Gilman, 478 F.3d 440, 446-48 (1st Cir. 2007).

In considering objections to a sentence's substantive reasonableness, we examine the district court's contemporaneous oral explanation of the sentence, 18 U.S.C. § 3553(c), its near-contemporaneous written statement of reasons, id. § 3553(c)(2), and what fairly can be gleaned by comparing what was argued by the parties or proffered in the PSI Report with what the sentencing court ultimately did, see Jiménez-Beltre, 440 F.3d at 519.[4] At the disposition hearing in this case, the district court emphasized that it grounded the sentence on three considerations: the support that the defendant stood to receive from his family, personal qualities indicating his potential for rehabilitation, and a perceived need to avoid disparity arising out of the length of the defendant's sentence relative to coconspirators' sentences. The government asserts that these proffered reasons, whether taken singly or in combination, cannot justify the district court's 91-month deviation.

We begin our assessment of these reasons with the defendant's family circumstances. The record is replete with letters from family and friends attesting to the defendant's virtues as a father, and the district court had the opportunity to see the devotion of the defendant's family members in person. The government seemingly grants that this ground, like every other

_____

[4]For reasons to which we shall return, we do not consider the district court's belated post-judgment Memorandum.

-13-

ground on which the district court relied, is supported by the record. But in an effort to blunt the force of this showing, the government points out that the policy statements incorporated within the guidelines generally discourage the consideration of family circumstances in sentencing decisions. See, e.g., USSG §5H1.6.

Policy statements issued by the Sentencing Commission are, of course, pertinent to sentencing determinations even under the now-advisory guidelines. See 18 U.S.C. § 3553(a)(5); see also United States v. Zapete-Garcia, 447 F.3d 57, 60 (1st Cir. 2006). Nevertheless, such policy statements normally are not decisive as to what may constitute a permissible ground for a variant sentence in a given case. See United States v. Simmons, 470 F.3d 1115, 1130 (5th Cir. 2006); United States v. Rivera, 448 F.3d 82, 86 (1st Cir. 2006); United States v. Smith, 445 F.3d 1, 5 (1st Cir. 2006); see also United States v. Kimbrough, 128 S. Ct. 558, 570 (2007) ("[A]s a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.") (internal quotation marks omitted). A district court therefore may take idiosyncratic family circumstances into account, at least to some extent, in fashioning a variant sentence. See, e.g., United States v. Grossman, ___ F.3d ___, ___ (6th Cir. 2008) [2008 WL 160612, at *4]; United States v. Lehmann, ___ F.3d ___,

___ (8th Cir. 2008) [2008 WL 150667, at *3]; United States v. Pauley, 511 F.3d 468, 474 (4th Cir. 2007).

The potential for rehabilitation also may comprise grist for the sentencing court's mill.  To be sure, there are valid reasons for regarding professions of post-offense rehabilitation skeptically.  See United States v. Bogdan, 284 F.3d 324, 330 (1st Cir. 2002) ("It is not uncommon for defendants to discover the virtues of introspection and remorse when facing the threat of punishment.").  But separating wheat from chaff is primarily a task for the district court, and a founded prospect of meaningful rehabilitation remains a permissible basis for a variant sentence under the now-advisory guidelines.  See 18 U.S.C. § 3553(a)(2)(C) ("The court . . . shall consider the need for the sentence imposed to protect the public from further crimes of the defendant."); see also Smith, 445 F.3d at 4-5.

Should one credit the district court's observations — and the standard of review inclines us in that direction — the defendant here made a particularly striking impression: two years of post-arrest incarceration prior to sentencing let him see the error of his former ways, renounce them, and embrace a renewed commitment to religion and family.  When this metamorphosis is combined with the reciprocal commitment exhibited by his family, the likelihood of meaningful rehabilitation rises to a level meriting some weight in the section 3553(a) calculus.  See, e.g.,

-15-

United States v. Phinazee, ___ F.3d ___, ___ (6th Cir. 2008) [2008 WL 320774, at *5]; Grossman, ___ F.3d at ___ [2008 WL 160612, at *4-5]; United States v. Gay, 509 F.3d 1334, 1337-38 (10th Cir. 2007); see also Gall, 128 S. Ct. at 601 (noting that, on the particular facts of the case, the district court was justified in "believing [defendant's] turnaround was genuine, as distinct from a transparent attempt to build a mitigation case"); cf. United States v. Sklar, 920 F.2d 107, 116-17 (1st Cir. 1990) (explaining that, "in an appropriate case, a defendant's presentence rehabilitative efforts and progress . . . can so far exceed ordinary expectations" as to provide a basis for a downward departure). While there are obvious limits on the sentencing court's discretion in this area, see, e.g., United States v. Milo, 506 F.3d 71, 75-76 (1st Cir. 2007), we believe that, in this case, those limits have not been breached.

The government also calumnizes the district court's consideration of the relative length of the coconspirators' sentences. That calumny has a certain superficial appeal: after all, section 3553(a)(6) aims primarily at the minimization of disparities among defendants nationally, see United States v. Navedo-Concepción, 450 F.3d 54, 60 (1st Cir. 2006); Smith, 445 F.3d at 5, not at disparities among codefendants in a conspiracy.

That does not mean, however, that the government's criticism adds up to a winning argument. A subpart of section

3553(a) directs a sentencing court to consider the need for a sentence to "promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). As the Gall Court observed, respect for the law diminishes if natural principles of justice, such as the principle that punishment should correlate with culpability, are ignored. See Gall, 128 S. Ct. at 599. With this thought in mind, we have on several occasions recognized that district courts have discretion, in appropriate cases, to align codefendants' sentences somewhat in order to reflect comparable degrees of culpability — at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system. See, e.g., United States v. Cirilo-Muñoz, 504 F.3d 106, 125-27 (1st Cir. 2007); id. at 134 (Lipez, J., concurring); United States v. Tejeda, 481 F.3d 44, 60 (1st Cir. 2007); United States v. Vázquez-Rivera, 470 F.3d 443, 449 (1st Cir. 2006).

The government's better argument may be that because the codefendants themselves received individualized sentences, those sentences are not fair congeners. As a matter of logic, this point is well-taken: insofar as defendants are measured and sentenced as individuals, their sentences' commensurability with one another proportionally decreases. But this construct easily can be turned on its head. A quick canvass of the codefendants' sentences reveals that the majority were variant, below-the-range sentences,

and a remarkable number of those sentences premised downward deviations on reasons quite similar to those proffered by the district court in the instant case.[5]  It follows that the government is incorrect in positing that the coconspirators' situations are entirely incommensurable.  Cf. Kimbrough, 128 S. Ct. at 574 (explaining that "some departures from [national] uniformity were a necessary cost of the remedy" that the Booker Court adopted).

The government presents another reason why the grounds relied on by the sentencing court are insufficient.  To this end, it says that, for the most part, those grounds are overly generic. We do not agree.

It is true, of course, that the grounds on which the district court relied, writ large, are not unique. Virtually all offenders mouth the vocabulary of contrition when the day of reckoning looms; many offenders have families who would be helpful in rehabilitation; some (perhaps not so many) have a readily detectable potential for rehabilitation; and some (occasionally may) have coconspirators who receive disparate sentences.  Yet,

---

[5]Of twenty-four coconspirators sentenced thus far, the district court sentenced three above their GSRs owing to mandatory minimum sentences.  Another four were sentenced within their GSRs, owing in part to safety valve reductions.  See USSG §5C1.2.  Of the remainder, only two were sentenced within their GSRs, and six (including the defendant) received downward deviations on account of some combination of family circumstances, a potential for rehabilitation, or a perceived need to minimize sentencing disparities among coconspirators.

-18-

such factors often involve matters of degree (here, for example, the sentencing court found that the defendant's family was unusually supportive; that the sincerity of his remorse, together with his character and personality traits, indicated a capacity for rehabilitation not frequently seen in recidivist defendants; that he had "demonstrated an unusually strong commitment to a law-abiding life;" and that "after he [has] served his very difficult sentence, he will stay on the right path and be the sort of person that he now wants to be").

Equally as important, sentencing decisions represent instances in which the whole sometimes can be greater than the sum of the constituent parts. So here: it is the complex of factors — their presence in combination — that verges on the unique. The factors themselves, if viewed in isolation, present a distorted picture.

In all events, what matters most is that the sentencing court made plain just how this defendant stood out from the mine-run of criminal defendants and why he, as an individual, deserved mitigation. No more was exigible to blunt the government's charge that the sentence imposed is insupportable because the district court mistook the commonplace for the unique.

This brings us to the more amorphous issue of the overall reasonableness of the sentence. In this regard, it is difficult to

do more than describe our reasons for trusting in the district court's exercise of its discretion.

The transcript of the disposition hearing reveals that the court took full account of the guidelines, considered each and all of the factors enumerated in section 3553(a), and pondered the prospect of rehabilitation and the defendant's relative culpability. The man before the court already had spent two years in prison while awaiting sentence. The court believed that it saw a changed man, who would return to the bosom of a committed and loving family after his release. The court had sentenced many of the other members of the same conspiracy and knew in detail how their crimes and their participation stacked up against the defendant's. Convinced that the defendant would not re-offend and that fairness as among similarly situated codefendants would be served, the court deviated downward from the GSR by 91 months.

We readily acknowledge that this is a significant variance, but what remains — 144 months — is by no measure a trivial restriction of the defendant's liberty. Indeed, the duration of the sentence is two years greater than the mandatory minimum sentence that Congress has prescribed for the crime of conviction, see 21 U.S.C. § 841(b)(1)(B), and hardly qualifies as a powder-puff sentence.

Post-Booker, we made clear that the linchpin of a reasonable sentence is a plausible sentencing rationale and a

defensible result.  Jiménez-Beltre, 440 F.3d at 519.  Gall has not dissipated the force of that conclusion; what it has done, however, is to emphasize both the amount of play that exists in the joints and the degree of respectful deference that is owed to the sentencing court's exercise of its informed discretion.  The sentence imposed here is grounded on a sensible (though not obligatory) view of the circumstances and the outcome — given those circumstances and the length of the sentence actually imposed — is plainly defensible.  We think it follows that the sentence passes muster under the Gall standard and is, therefore, substantively reasonable.

In a last-ditch effort to turn the tide, the government suggests that the 144-month sentence is unreasonable because it placed the defendant within the GSR that would have obtained had he not been a career offender.  In the government's view, this outcome effectively nullifies Congress's intent to punish recidivism more severely.  See 28 U.S.C. § 994(h) (directing the Sentencing Commission, with respect to career offenders, to "assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized"); see also United States v. Caraballo, 447 F.3d 26, 27-28 (1st Cir. 2006).

We believe that this suggestion is wide of the mark.  The Supreme Court's recent decision in Kimbrough, 128 S. Ct. at 574-75, opened the door for a sentencing court to deviate from the

guidelines in an individual case even though that deviation seemingly contravenes a broad policy pronouncement of the Sentencing Commission. Here the district court grounded the defendant's sentence in case-specific considerations, which is the accepted practice in the post-Gall world. See Grossman, ___ F.3d at ___ [2008 WL 160612, at *5].

To say more about the defendant's sentence would be supererogatory. Given the totality of the circumstances, we cannot say that the sentence imposed represents either an unreasonable application of the factors enumerated in section 3553(a) or an impermissible repudiation of the policies embodied in the sentencing guidelines. Accordingly, we conclude that the district court did not abuse its discretion in imposing the sentence.

There is one loose end: the Memorandum (a document that purported to explicate the sentencing court's rationale). To begin, we take a dim view of the timing; the Memorandum was not issued until nearly a year after sentence was imposed and after this case had been briefed on appeal. That timing is problematic because the applicable statute requires the district court "at the time of sentencing, [to] state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c) (emphasis supplied).[6] The defendant has a right to be present when

---

[6]The court must then reduce this statement, contemporaneously or nearly so, to writing and attach it to the judgment. See 18 U.S.C. § 3553(c)(2). With respect to that near-contemporaneous

-22-

this is done, as does the prosecutor.  Both are entitled to an on-the-spot opportunity to respond to the sentencing court's rationale, and the issuance of a belated sentencing memorandum frustrates this desirable goal.

Relatedly, "[a]s a general rule, with only limited exceptions, entry of a notice of appeal divests the district court of jurisdiction to adjudicate any matters related to [an] appeal." United States v. Distasio, 820 F.2d 20, 23 (1st Cir. 1987).  The district court's attempt to explain its sentencing rationale, well after the filing of a notice of appeal, transgresses the spirit, if not the letter, of this rule.  Introducing such a wild card into the deck is conducive to confusion.  See United States v. Brooks, 145 F.3d 446, 456 (1st Cir. 1998).

Finally, when the district court files a tardy sentencing memorandum after an appeal has been taken, it runs a risk of creating an unwelcome appearance of partisanship.  Its writing understandably may be viewed by the appealing party as a quasi-brief, filed as a way of defending the sentence against the appeal. See United States v. Pelullo, 14 F.3d 881, 907 (3d Cir. 1994)

---

writing, we have stated that "where a district court's oral expression of its sentencing rationale varies materially from its subsequent written expression of that rationale, appellate courts have tended to honor the former at the expense of the latter." United States v. Vega-Ortiz, 425 F.3d 20, 22 (1st Cir. 2005) (quoting United States v. Cali, 87 F.3d 571, 579 (1st Cir. 1996)).

-23-

(noting that the "delayed filing" of such a memorandum "may raise suspicions of partiality").

Despite these obvious drawbacks, we are reluctant to rule out any and all use of such post-judgment memoranda. The case law indicates that there may be circumstances in which an appellate court appropriately may consider such a post-judgment memorandum. See, e.g., United States v. Bennett, 161 F.3d 171, 185-87 (3d Cir. 1998); see also In re Silberkraus, 336 F.3d 864, 869 (9th Cir. 2003) (holding that a bankruptcy court retained jurisdiction to publish written findings of fact and conclusions of law after notice of appeal had been filed); cf. Gibbs v. Buck, 307 U.S. 66, 78 (1939) (holding that, despite district court's issuance of findings of fact and conclusions of law after appeal had been taken, "[i]t would be useless . . . to reverse the order . . . and remand the cause" only to have the same findings and conclusions re-entered); Aoude v. Mobil Oil Corp., 862 F.2d 890, 895 (1st Cir. 1988) (similar). We conclude, therefore, that a federal appellate court has the discretion, in an appropriate case, to accept a post-judgment memorandum (including but not limited to a post-judgment sentencing memorandum)[7] even if it is not filed by the district court until after the docketing of a notice of appeal.

---

[7]Although this case involves a post-judgment, post-appeal sentencing memorandum, the same pernicious practice has gained some currency in civil cases. That is an area in which it is even more mischievous.

Still, the drawbacks of such belated filings are real. In the interests of fairness, therefore, the discretion to accept and rely upon them should be exercised sparingly.[8] District courts should be encouraged to explain their sentences at the time of sentencing and to eschew belated post-judgment amplifications. In those few situations in which amplification is deemed necessary, the sentencing court should act expeditiously so as to avoid interference with either the appellate process or the parties' rights. The sentencing court also should be mindful that the court of appeals has the authority, should it deem further explanation either necessary or desirable, to retain appellate jurisdiction and remand to the district court for that explanation. See, e.g., United States v. Quinones, 26 F.3d 213, 219-20 (1st Cir. 1994). Such a procedure presents none of the concerns raised by a sentencing court's unilateral decision belatedly to file a post-judgment, post-appeal sentencing memorandum.[9]

---

[8]In an effort to balance the advantages and disadvantages presented by district courts' use of post-judgment, post-appeal memoranda, one court of appeals has promulgated a rule regulating the submission of such memoranda. See 3d Cir. R. 3.1 (allowing district courts to issue memoranda within fifteen days following the filing of appeal). The Third Circuit has indicated that, in promulgating its rule, it did not intend either to encourage that practice or to alter the usual custom of issuing memoranda in a timely manner, contemporaneous with the entry of judgment and prior to the taking of an appeal. See id., committee cmt.

[9]In seeking strongly to discourage elaborations done long after the entry of judgment, we intend no criticism of the able district judge who authored the Memorandum. There has been a slow escalation of this practice in the First Circuit, and this court

In this case, we need not probe the point more deeply. Refined to its bare essence, the Memorandum essentially restates (albeit more expansively) the three elements on which the district court relied in imposing the sentence. Nothing contained in it adds incrementally to our assessment of the reasonableness vel non of the sentence. We therefore have exercised our discretion in favor of setting the Memorandum to one side and have not considered its contents in our evaluation of the substantive reasonableness of the defendant's sentence.

We need go no further. Under <u>Booker</u> and <u>Gall</u>, there is a heavy emphasis on a sentencing court's informed discretion. In this instance, the sentencing court exercised that discretion and chose leniency. In the process, it offered a plausible rationale and reached a defensible result. Consequently, we uphold its sentencing determination despite the fact that the defendant received the benefit of a substantial downward deviation from his guideline sentencing range.

**Affirmed**.

---

has not hitherto had an opportunity to express its views. Many of us have been trial judges and we recognize the immense pressures on district courts and the understandable desire of busy trial judges not to invest time and effort in extravagant explanations that may prove to be unnecessary. But as we have noted above, the disadvantages of the practice are substantial.