# United States Court of Appeals
## For the First Circuit

No. 23-1446

UNITED STATES,

Appellant,

v.

AGUSTIN VINAS, a/k/a Amigo,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Howard, Circuit Judges.

Lauren S. Zurier, Assistant United States Attorney, with whom
Zachary A. Cunha, United States Attorney, was on brief, for
appellant.
Miriam Conrad for appellee.

July 1, 2024

**BARRON**, **Chief Judge**.    In this appeal, the government challenges Agustin Vinas's time-served prison sentence for his murder-for-hire-related conviction under 18 U.S.C. § 1958.    We affirm.

## I.

On April 19, 2021, the FBI received a tip from a confidential source ("CS-1") that Vinas, who was then living in Rhode Island, was attempting to hire an individual to commit a murder.[1]    CS-1 informed the FBI that Vinas, whom CS-1 had known socially for several years, had told CS-1 about his desire to arrange the murder of a contractor ("Victim 1").

Vinas, who worked as a subcontractor, told CS-1 that he was owed $8,500 by Victim 1 for construction work.  Vinas explained to CS-1 that his attempts to collect the debt had been unsuccessful and that Victim 1 had threatened to harm Vinas and his family if he continued to pursue the money he was owed.  As a result, Vinas said he wanted to hire someone to kill Victim 1.  CS-1 told Vinas that CS-1 would be in touch with the contact for someone who could carry out the murder.

---

[1] We draw the facts from the presentence investigation report ("PSR"), the factual findings of which neither side contested, and the transcript of the sentencing hearing.  See United States v. Edwards, 857 F.3d 420, 421 n.1 (1st Cir. 2017).

- 2 -

After verifying some of the information CS-1 provided, an FBI agent instructed CS-1 to call Vinas and set up a meeting on the evening of April 20 to discuss the prospective murder. During this second meeting -- which took place in Providence, Rhode Island and which CS-1 surreptitiously recorded -- Vinas provided CS-1 with the cellphone number, address, and business name of Victim 1. Vinas also informed CS-1 that he wanted to have a second person -- the business partner of the contractor ("Victim 2") -- killed as well. Vinas further stated that he wanted the victims to be tortured before they were killed and that he would be willing to pay a total of $3,000 for the two murders, with an additional $500 bonus if the hitman could make the bodies "disappear." Finally, Vinas revealed that he had been surveilling the intended victims and that he had already been in contact with another potential hitman.

The FBI verified that the phone number, business name, and address that Vinas had provided all belonged to Victim 1. On April 22, CS-1 arranged another meeting with Vinas, this time in Pawtucket, Rhode Island. CS-1 brought an undercover law enforcement officer who posed as a hitman. Vinas provided the undercover officer with information that identified Victim 1 and repeated his offer to pay $3,500 for the murders. The undercover officer told Vinas that he would be in touch after making the necessary arrangements for the murders.

- 3 -

On April 26, Vinas met with the undercover officer and CS-1 in the parking lot of a Home Depot in Attleboro, Massachusetts. Vinas gave the undercover officer a $100 cash deposit for the killing and showed him proof that he had $3,500 available to pay upon completion of the murders. Vinas also agreed to provide another $300 deposit to the undercover officer upon their next meeting.

The undercover officer and Vinas met one final time on April 29. At this meeting, which also took place at the Attleboro Home Depot parking lot, Vinas provided the officer with an additional $200 as well as Victim 1's license plate number and the address of a home where Vinas believed Victim 1 was working on a construction job. At the end of the meeting, the undercover officer asked Vinas whether Vinas was sure that he wanted to go through with the plot and emphasized that, if they proceeded past this point, the "job" could not be stopped. Vinas replied, "I want you to make that guy disappear."

The following day, the FBI arrested Vinas. On May 14, 2021, a federal grand jury in the District of Rhode Island handed up an indictment charging Vinas with two counts, both under 18 U.S.C. § 1958, relating to his conduct in the commission of a murder-for-hire plot.

Vinas entered into a plea agreement with the government on October 13, 2022, under the terms of which he pleaded guilty to

the indictment's first count, using facilities of interstate commerce in the commission of murder-for-hire, and the government agreed to dismiss the second count, related to interstate travel in the commission of murder-for-hire. The parties stipulated to a total offense level of 37 under the United States Sentencing Guidelines ("Guidelines") -- subject to adjustments for acceptance of responsibility -- and the government agreed to recommend a sentence within the Guidelines sentencing range: the statutory maximum of ten years.

Prior to sentencing, the government submitted a two-page sentencing memorandum in which it sought a sentence of ten years' imprisonment. The government argued in its memorandum that "[a]mong the most significant factors" underlying its recommended sentence were "specific deterrence of [Vinas] and general deterrence of those who might consider similar conduct."

The defense submitted a six-page sentencing memorandum, accompanied by numerous exhibits. The memorandum argued for a sentence of time served -- the nearly two years that Vinas had already spent in pretrial detention.

The sentencing memorandum described the background of the dispute between Vinas and Victim 1 and informed the District Court that Vinas made several attempts to peacefully collect the money that he was owed from Victim 1 but that Victim 1 had responded by assaulting Vinas and threatening Vinas and his family. The

sentencing memorandum also noted that Vinas reported the assault and threats to the local police on two different occasions but that these reports were never acted upon. Attached to the memorandum were corroborating police reports and a transcript of a recorded telephone call in which Victim 1 threatened to kill Vinas and told Vinas that he and his family "are going to have to move out of the country." While the memorandum acknowledged that Vinas "made the terrible decision to take matters into his own hands," it argued that the evidence of these threats and Vinas's efforts to get assistance from the authorities mitigated his culpability to some extent.

Vinas's sentencing memorandum also highlighted that, while in pretrial custody, Vinas had been diagnosed with a depressive disorder with paranoid features including auditory hallucinations, and that he had been placed on antidepressant and antipsychotic medications. Alongside the sentencing memorandum, the defense submitted forty-nine letters of support written by Vinas's family, friends, clergy, and contracting clients.

The government submitted a one-page response to the sentencing memorandum. It emphasized that the undercover officer posing as a hitman had given Vinas a final opportunity to stop the plot but that Vinas had not taken it.

Vinas was sentenced on April 18, 2023. At the outset of the sentencing hearing, the District Court confirmed that neither

- 6 -

side had any objections to the PSR that had been prepared by the U.S. Office of Probation and its calculation of a 120-month Guidelines prison sentence based on a total offense level of 34 -- reduced 3 levels from 37 based on Vinas's acceptance of responsibility -- and Vinas's criminal history category, which was I. The Court then offered each side an opportunity to be heard before pronouncing Vinas's sentence.

The government did not request any specific length of sentence during the sentencing hearing but advocated for "a substantial sentence to deter [Vinas], [and] to deter others as well who might think about doing something similar in the future." The government acknowledged that "the Court certainly has a challenge here as to what's the appropriate sentence [to] . . . provide just punishment in these circumstances" and that "clearly there's a lot of people in the Defendant's corner." Indeed, cataloging the letters in support of Vinas, the government noted that "at least 24 of them refer to the fact that he was hard working, 15 of them or so said that he was respectful, and another 16 or so said that he was honorable." The government also noted that the letters made clear that Vinas had "shown kindness to his family and to his friends and to members of his community." The government emphasized, however, that the letters just highlighted "a big gap" between the person described in the letters, "who so

many are willing to say is a good person[,] . . . and the same person who did everything he could to end another person's life."

The government also acknowledged that Vinas "had some mental health issues" that were untreated at the time of the offense conduct. The government nevertheless argued that the mitigating circumstances presented by the defense did not explain the "gap" between how Vinas was presented by the defense and his "contracting to go out and have individuals killed," which the government argued was "not that type of conduct that we can address with supervised release and counsel[]ing and close supervision."

Vinas's defense counsel reaffirmed the request for a time-served sentence. Responding to the government's argument about the "gap" between the version of Vinas described in the letters and his criminal conduct, defense counsel emphasized the interaction between Victim 1's threats and Vinas's then-untreated mental illness. Defense counsel emphasized the evidence of Vinas's rehabilitation including his undergoing mental health treatment and his completion of several personal growth programs while he was in pre-trial detention. Defense counsel argued that, given Vinas's age of fifty-three and lack of a prior criminal history, a time-served sentence would appropriately account for not only "retribution and deterrence but also rehabilitation and . . . [Vinas's] personal characteristics as well as the characteristics of what led to the crime."

Vinas also spoke on his own behalf. Vinas asked forgiveness "from the deepest and most profound parts of my heart" from Victim 1 and his family. Addressing the District Court, Vinas said, "I cannot change the past; but as far as the present and the future, I do have very lofty goals and purposes that would help not only my family but the community in general."

The District Court then explained that it would be imposing a prison sentence of time served. The District Court began by noting that Vinas's crime "is one of the most serious, if not the most serious, that I've seen come before me in my 12 years on the bench." Addressing Vinas directly, the District Court stated that it continued to struggle to understand "how you, the person that I feel like I've gotten to know through the 49 letters . . . and the information that I read about you and know about you, could have been of the mindset to have commissioned someone to murder someone."

The District Court then identified the sentencing factors set forth in 18 U.S.C. § 3553(a): specific and general deterrence, rehabilitation, retribution, and promoting respect for the law. As to specific deterrence, the District Court stated that it had "little to no doubt . . . after getting to know [Vinas] that [he] will never commit a crime like this or any crime again." Then, turning to general deterrence, the District Court stated:

> I don't believe that the sentence I give you will deter people one way or the other in the public on whether to commit a crime or not. And the reason for that is . . . people don't commit crimes based on the level of punishment. Science and sociology tell us they do it more likely on whether they're going to get caught or not, not on what the punishment will be. I always tell the story that when I speed, I don't think about, oh, I could get a $100 ticket or a $200 ticket. I think, hmm, is there a cop around the corner? Right? It's the likelihood of getting caught.

Concluding the discussion of this factor, the District Court explained that "when you look at the second factor of deterring the public, I think any substantial sentence will accomplish that."

As for rehabilitation, the District Court determined that Vinas was "on the road already to that with the intervention that [he'd] gotten," including the treatment he was receiving for his mental illness. And, as for the final two § 3553(a) factors, the District Court stated there was "no question in [its] mind" that Vinas "deserve[d] just punishment and . . . a substantial sentence" given the seriousness of his crime.

The District Court emphasized that it had struggled weighing each of these factors in coming to an individualized sentence that was "sufficient but not more than necessary to accomplish" them in Vinas's case. The District Court also highlighted letters supporting Vinas, stating to the letter writers who were present at sentencing that the District Court had "never read such a consistently honest portrait, a singular

- 10 -

portrait of a human being as I did in reading your letters."  The

District Court specifically addressed Vinas's daughter whose

letter gave "great insight into who your father is" and "moved me

more than any letter that I've ever received, the way you described

your upbringing and the meaning, how your dad showed his love for

you."

Then, addressing Vinas once more, the District Court

explained its reasoning for, given these factors, making the "very

difficult decision" to render a sentence of "two years, the time

you served."

> You've lived 50-some-odd years as a solid
> member of the community, as an outstanding
> spouse and parent to five wonderful children.
> You've contributed to the community.  You've
> lived the life that we want people to come
> here and work and live.  You built a successful
> business.  You gave back to your community.
> You've been removed from your job.  You
> can't provide -- you haven't provided for your
> family for the last two years.  You spent two
> years incarcerated in a pretrial facility, and
> you've been removed from this family that
> clearly adores you and you adore.
> And being away from them for two years is
> a substantial sentence and imposes just
> punishment consistent with and commensurate
> with the nature of -- and the seriousness of
> the crime.
> That wouldn't be true of many people.  It
> wouldn't be.  But for someone like you who's
> lived the life that you had and was forced to
> leave it and lose your liberty for two years,
> the Court in its requirement that it build an
> individual sentence looking . . . when you dig
> really down and you do it, two years for you
> is a substantial sentence that factors in all

of the aims of sentencing that I'm required to consider.

The District Court also imposed three years of supervised release and required Vinas to participate in mental health and substance abuse treatment programs and to refrain from the consumption of alcohol. Neither side voiced any objections to the sentence. The government timely appealed.

## II.

A sentence can be challenged on both procedural and substantive grounds. "The procedural dimension includes errors such as failing to consider appropriate sentencing factors, predicating a sentence on clearly erroneous facts, or neglecting to explain the rationale for a variant sentence adequately. The substantive dimension focuses on the duration of the sentence in light of the totality of the circumstances." United States v. Del Valle-Rodríguez, 761 F.3d 171, 176 (1st Cir. 2014) (internal citation omitted) (citing Gall v. United States, 552 U.S. 38, 51 (2007)). The government frames its challenge to Vinas's sentence as pertaining only to the substantive reasonableness of the sentence's length.

## A.

The government is most fairly read -- in asking for a "substantial sentence" -- to have argued below for a sentence greater than the time-served sentence that Vinas had sought. Thus,

because the government argued below for a longer sentence than Vinas received, the government preserved its contention that Vinas's time-served sentence is unreasonably short in light of the sentencing factors enumerated in 18 U.S.C. § 3553.[2] Cf. Holguin-Hernandez v. United States, 589 U.S. 169, 173-74 (2020) ("Judges, having in mind their 'overarching duty' under § 3553(a), would ordinarily understand that a defendant [in arguing for a shorter sentence] was making the argument (to put it in statutory terms) that the shorter sentence would be 'sufficient' and a longer sentence 'greater than necessary' to achieve the purposes of sentencing. Nothing more is needed to preserve the claim that a longer sentence is unreasonable." (internal citation omitted)). But, even when such a challenge to a sentence's length is preserved, our review remains deferential, as our review "is limited to determining whether [the] sentence, 'in light of the totality of the circumstances, resides within the expansive universe of reasonable sentences.'" United States v. Rossignol,

_____

[2] Vinas briefly suggests that, by failing to expressly request any specific length of sentence during the sentencing hearing, the government may have forfeited even its substantive reasonableness challenge to the length of Vinas's sentence. However, the government made clear its position during the sentencing hearing that, in its view, a sentence of time served would not be adequate. It did not need to do more than that to preserve a challenge to the reasonableness of the sentence's length. See United States v. Colón-De Jesús, 85 F.4th 15, 24-25 (1st Cir. 2023).

780 F.3d 475, 477 (1st Cir. 2015) (quoting United States v. King, 741 F.3d 305, 308 (1st Cir. 2014)).

"[T]he hallmarks of a substantively reasonable sentence are a plausible sentencing rationale and a defensible result." United States v. Rodríguez-Cruz, 997 F.3d 362, 366 (1st Cir. 2021). We are "obliged to consider the extent of the variance" whenever a "sentence is outside the" Guidelines range. United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008). But "even in that posture [we] 'must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance.'" Id. (quoting Gall, 552 U.S. at 51).

Insofar as the government's substantive reasonableness challenge rests on the contention that the seriousness of Vinas's crime precludes "a mere two years' imprisonment" from constituting a defensible result, we cannot agree.[3] The government provides no basis for our concluding that, given the unquestionably serious nature of the crime, only a longer sentence would be defensible, regardless of the mitigating evidence in the record.

It is not as if the District Court held that this offense warranted no period of incarceration. Rather, the District Court

---

[3] Vinas points out in his brief, and the government does not dispute, that, accounting for good-time credits, the length of time Vinas was incarcerated is approximately the amount of time that a defendant sentenced to twenty-eight months would serve. See 18 U.S.C. § 3624(b).

- 14 -

determined merely that Vinas's two years of separation from family, friends, and society due to his pre-trial detention and three years of supervised released was itself a substantial sentence when considered in relation to the mitigating evidence. We do not see how that conclusion is necessarily so outside "the expansive universe of defensible sentences," Rossignol, 780 F.3d at 477 (quoting King, 741 F.3d at 308), that it is an indefensible one, see Rosales-Mireles v. United States, 585 U.S. 129, 139 (2018) ("'To a prisoner,' th[e] prospect of additional 'time behind bars is not some theoretical or mathematical concept.' '[A]ny amount of actual jail time' is significant . . . ." (second alteration in original) (internal citations omitted) (first quoting Barber v. Thomas, 560 U.S. 474, 504 (2010) (Kennedy, J., dissenting), then quoting Glover v. United States, 531 U.S. 198, 203 (2001))). Nor does the government identify any authority compelling a different conclusion.

Relatedly, the government argues that the District Court put too much weight on mitigating factors including Vinas's community ties, family circumstances, and steps towards rehabilitation. We have more than once affirmed, however, a below-Guidelines sentence that was justified in part on these same sorts of mitigating factors where the sentencing court explained how the particular defendant "stood out from the mine-run of criminal defendants and why he, as an individual, deserved mitigation."

- 15 -

Martin, 520 F.3d at 95; see also United States v. Prosperi, 686 F.3d 32, 48 (1st Cir. 2012) ("[T]he circumstances of Prosperi's family are atypical and powerful, both in justifying a variance and in the home confinement actually chosen."). For example, in Martin, we affirmed a below-Guidelines sentence that, similar to the sentence here, was driven, in part, by "letters from family and friends attesting to the defendant's virtues as a father." 520 F.3d at 93.

The government does argue that the mitigating factors that the District Court relied upon are not "'atypical,' 'idiosyncratic,' or 'powerful' enough to justify . . . the extreme lenience of the sentence ultimately imposed." Sentencing courts are not required, however, to "afford each of the section 3553(a) factors equal prominence. The relative weight of each factor will vary with the idiosyncratic circumstances of each case, and the sentencing court is free to adapt the calculus accordingly." United States v. Rivera-Rodríguez, 75 F.4th 1, 30 (1st Cir. 2023) (quoting United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006)); see also United States v. Clogston, 662 F.3d 588, 593 (1st Cir. 2011) ("That the sentencing court chose not to attach to certain of the mitigating factors the significance that the appellant thinks they deserved does not make the sentence unreasonable."). Here, the District Court explained that the letters submitted in support of Vinas painted the most

"consistently honest portrait" of a defendant the Court had ever seen and gave the Court confidence that Vinas would not commit future crimes, would return to being a productive member of society, and was deserving of a below-Guidelines sentence. Thus, notwithstanding the concerning nature of the criminal conduct, "[n]o more was [required] to blunt the government's charge that the sentence imposed is insupportable because the district court mistook the commonplace for the unique." Martin, 520 F.3d at 95.

**B.**

The government does also advance two more narrow-gauged arguments in challenging the sentence: that the District Court categorically refused to consider general deterrence, and that it created a disparity with defendants in other cases who were given longer sentences for the same statutory violation. Although the government did not expressly raise either of these arguments below, the government contends that each is necessarily subsumed under its challenge to the substantive reasonableness of the sentence's length that it did unquestionably preserve, in part because of the well-recognized ways in which challenges to a sentence's substantive reasonableness and procedural reasonableness can overlap. United States v. Melendez-Hiraldo, 82 F.4th 48, 57 (1st Cir. 2023) ("An adequate explanation for an upward variance and a plausible rationale for that variance are almost always two sides of the same coin." (cleaned up)). The government thus argues that

we must treat as preserved all of the arguments it advances "to the extent that [they] bear[] on the reasonableness of [Vinas's] sentence." United States v. McDonough, 727 F.3d 143, 165 n.15 (1st Cir. 2013).

But "substantive" and "procedural" labels aside, the important question in assessing whether a ground for challenging a sentence has been preserved is whether the district court was apprised of the ground for the challenge, even if only by implication. See United States v. Colón-Cordero, 91 F.4th 41, 50 (1st Cir. 2024). Vinas argues that the government did not apprise the District Court of the contentions that it now presses on appeal. Specifically, Vinas asserts that the government did not raise below either the claim that the District Court erred by categorically refusing to consider general deterrence or the argument that it erred by failing to account for the disparity in Vinas's sentence relative to the sentences that others convicted of the same offense have received. We agree with Vinas.

The government did not say a word below that raised any concerns about the District Court categorically ignoring general deterrence or creating a disparity. We thus conclude that our review of each of these grounds for challenging the sentence is for plain error. See United States v. Vargas-Martinez, 15 F.4th 91, 98 (1st Cir. 2021) ("Under the plain error standard, the [appellant] must show: '(1) that an error occurred (2) which was

- 18 -

clear or obvious and which not only (3) affected the [appellant]'s substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" (quoting United States v. Medina-Villegas, 700 F.3d 580, 583 (1st Cir. 2012)).

Vinas appears to be correct that the government has waived any argument that it can satisfy the demanding plain error standard. Even "after [Vinas] asserted in [his] opening brief that plain error review applied to [the government's] specific substantive claims, [the government] made no effort in [its] reply brief to argue plain error." Colón-De Jesús, 85 F.4th at 25 n.14.

But even if we were to look past this waiver, we do not see how the government has met the plain error standard as to either of its unpreserved claimed errors. To be sure, some of the statements the District Court made at sentencing could be interpreted, in isolation, to reflect the view that general deterrence is categorically entitled to no weight in sentencing. In particular, the District Court's statement that a person considering speeding would be equally deterred by the possibility of a $100 or $200 speeding ticket does not provide an adequate explanation for why a prison sentence could not function as a general deterrent. Given that § 3553 requires courts to consider general deterrence in imposing a sentence, there would be a concern that the District Court's sentencing rationale fell short if this

- 19 -

statement were all the District Court had said in regard to general deterrence. But it is not "clear or obvious" that, when the sentencing transcript is read as a whole, Vargas-Martinez, 15 F.4th at 98, the District Court categorically rejected general deterrence as a factor. Instead, the District Court explained that, in considering the need for general deterrence, it concluded that this factor did not provide a reason for imposing a longer sentence than the -- to use the District Court's own description -- "substantial" sentence that was imposed.

As for the potential sentencing disparity between Vinas's sentence and the sentences that had been imposed on other defendants who had committed similar offenses, the government raised this disparity argument only in a footnote in its opening brief. Moreover, in doing so, the government relied solely on United States v. Daoud, 980 F.3d 581 (7th Cir. 2020).

In that case, however, the government had asked the district court at sentencing to consider the sentences imposed on similar offenders, but the district court refused to do so. See id. at 591. Here, by contrast, the government made no similar request of the District Court at sentencing, and so we have no basis for concluding that the District Court refused to consider relevant comparable sentences that the government had presented.

We thus do not see how Daoud supports the government's disparity-based challenge, let alone how that precedent clearly or

obviously does so.  So, this aspect of the government's challenge to the sentence fails as well.

### III.

For the foregoing reasons, the judgment of the District Court is **affirmed**.