# United States Court of Appeals
## For the First Circuit

No. 08-1554

UNITED STATES OF AMERICA,

Appellee,

v.

CESAR ZAPATA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Torruella, Tashima,* and Lipez, Circuit Judges.

David J. Apfel, with whom Alison V. Douglass, Elianna J. Marziani and Goodwin Proctor LLP were on brief, for appellant.
Neil J. Gallagher, Jr., Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, and Mark T. Quinlivan, Assistant United States Attorney, were on brief, for appellee.

December 16, 2009

---

*Of the Ninth Circuit, sitting by designation.

**LIPEZ, Circuit Judge**.  In exchange for the dismissal of a drug conspiracy charge in an indictment, appellant Cesar Zapata pled guilty to a one-count information charging unlawful use of a communication facility in connection with a drug trafficking offense.  See 21 U.S.C. § 843(b).  He was sentenced to a term of 48 months' imprisonment, the statutory maximum.  In this appeal, Zapata claims that his sentencing was procedurally flawed and that the sentence imposed is unreasonable, insufficiently supported by the evidence, and in violation of the Sixth Amendment.  Having carefully considered each of these claims, we find no error and therefore affirm the district court's judgment.

## I.

The following facts are drawn from the change-of-plea colloquy, the presentence investigation report ("PSR"), and the transcript of an evidentiary hearing on the drug quantity attributable to Zapata.  See United States v. Stone, 575 F.3d 83, 85 (1st Cir. 2009); United States v. Jiminez, 498 F.3d 82, 84 (1st Cir. 2007).

### A. The Investigation

After several cocaine seizures took place in early 2005 in New York City, Boston, and Springfield, Massachusetts, federal and state law enforcement authorities initiated a wiretap investigation targeting the drug distribution activity of Sergio Saldana-Alcantara ("Saldana"), Zapata's business partner at Pine

Point Auto Sales in Springfield. Through phone records related to the cocaine seizures, investigators were also led to Zapata, a fifty-seven-year-old father and grandfather with no prior criminal record. Between May and August 2005, investigators conducted a series of state wiretaps on Zapata's cellular phone, five cellular phones used by Saldana, and the cellular phone of one of Saldana's customers, George Samuels.[1]

Thousands of calls were intercepted during the three months of wiretapping, but none of the taped conversations included explicit reference to cocaine or drug sales. The government, however, maintains that coded language in the calls showed that Zapata was actively involved in the drug conspiracy with Saldana, who was supplying his customers with kilogram quantities of cocaine. Among the intercepted calls were several conversations involving Saldana, Zapata and a buyer in New York known as "Juan" who at times also provided cocaine to Saldana, who then redistributed it to Samuels. According to the government, the calls also showed that Zapata had given cocaine he received from Saldana to a customer of his own, Freddy Domínguez.

At the evidentiary hearing on drug quantity after Zapata's change-of-plea hearing, DEA Special Agent Jonathan

---

[1] A series of six fifteen-day wiretaps were placed on Zapata's phone between May 31 and August 27. Wiretaps were placed on Saldana's phones between July 1 and August 27, and a single wiretap was in effect on Samuels' phone between August 17 and August 27.

Shankweiler described in particular three sets of calls that took place in June, July and August 2005.  The June calls were between Zapata and Domínguez, and Shankweiler testified that they related to Domínguez's unsuccessful attempt to obtain cocaine from Zapata without paying for it.[2]  The July calls were identified as the basis for the information to which Zapata pled guilty.[3]  In multiple calls on July 4 and 5, Juan called Zapata's phone or vice versa, and Zapata twice handed his phone to Saldana to continue conversations that he had begun with Juan.  Shankweiler testified that this series of calls related to Juan's desire to pay Saldana

---

[2] For example, in one call, Zapata asked Domínguez: "And for, for those hundred (100) pesos, what's up?  So I can let the guy know."  Domínguez replied that he didn't "have anything right now" because he was waiting for "this guy" to call him, and Zapata then asked: "What are you going to do, are you going to take it up front or what?"  According to the PSR, agents believed the "hundred pesos" was 100 grams of cocaine.  Shankweiler testified that Zapata was asking if Domínguez wanted the drugs "up front," meaning that he would get the cocaine without paying for it at that time.  In another call the next day, Domínguez told Zapata that "I have the papers now," which the agents understood to mean that he now had the money to pay for the drugs.  Shankweiler testified that, in his experience with "numerous overheard drug conversations, 'papers' is money."

[3] The information stated:

On or about July 4, 2005, in the District of Massachusetts and elsewhere,
**CESAR ZAPATA**
defendant herein, did knowingly and intentionally use a communication facility, to wit: a cellular telephone assigned telephone number (413) 883-7649, in committing, causing and facilitating a drug trafficking offense, specifically Conspiracy to Distribute Cocaine in violation of Title 21, United States Code, Section 846.

and Zapata money owed for drugs distributed the previous day and to get more cocaine from them.[4]

---

[4] In the first call on July 4, Juan called Zapata and told him that his friend, "the one from last night . . . He wants me to see him to do the special that there was yesterday?  He wants to continue with the same special, so I don't know what to do." Zapata told Juan, "hold on, talk to the man," and he put Saldana on the phone.  Juan then told Saldana that his friend, "the last one I met with last night," called him "to dance at two discotheques so that then, you know, now, he got used to yesterday's special, so . . . I told him I have to ask first."  The conversation then continued:

> SALDANA:  No, tell him no . . . only if he just wants half, another half block up front, and that's the only way, if it is, it is . . .
> JUAN: Okay.  Half a block more up front?
> SALDANA: If he has given street for it, if he hasn't given street and he isn't, and he doesn't go right away, uh . . .
> JUAN: Oh, no, he's going right away.  He has to give me four (4) pesos for last night. . . So, he's going to go twice.
> SALDANA: So have him give it to you all together already and that's finished.
> JUAN: Alright then.  Let me talk to him.
> SALDANA: Okay
> JUAN: Okay, okay.

Shankweiler testified that this conversation was a coded request for two kilograms of cocaine (two "discotheques") at the same price as the day before ("the same special").

Later that day, Juan again called Zapata and said: "Ask this guy if you are going to come over tonight, because there are fifty-five (55) pesos there."  Zapata replied that they were coming the next day because "we're all drinking."  Zapata again put Saldana on the phone with Juan, who repeated: "I have the fifty-five (55) pesos here for you to pay the rent there."  Saldana replied that he would "go by there later on."

Zapata spoke with Juan again the next day, July 5, and their conversation included the following exchange:

> JUAN: Yeah, well, I'm just taking it easy here.  I have

The transaction anticipated in those calls was believed to have occurred within the following few days. Saldana went to New York on July 5, without Zapata, and had some kind of interaction with Juan, perhaps collecting the "seventy (70) something pesos" that Juan had mentioned on the phone. A series of phone calls between Saldana and Juan the next day, July 6, led investigators to set up surveillance in Springfield. Consequently, on July 7, Zapata was observed entering Saldana's home empty-handed and exiting with a box measuring approximately sixteen inches by twelve inches by two inches. Later that day, the two men were followed to New York, where Zapata was observed carrying the box into an apartment building where investigators believed Juan lived with Saldana's mother. Shankweiler testified that he believed the box contained cocaine.

The third set of calls occurred on August 18 as Saldana and Zapata were driving back to Springfield from New York. According to Shankweiler, investigators intercepted calls

the seventy (70) something pesos so that, so that you can cover the rent.
ZAPATA: Uh-huh.
JUAN: Yes, so you can call me, and tell me if you're going to come over, so that I can get a money order for you to pay, because the rent was due on the first.
ZAPATA: Uh-huh.
JUAN: That way you [plural] can make up the difference with that. . . seventy-something pesos that I have there.
ZAPATA: Okay, that's fine. That's fine. We'll call you soon.

suggesting that Saldana had obtained a sample of cocaine from Juan that he was bringing to Samuels. In one of the calls, Saldana told Samuels, "I've got a picture for you, the flower," and Shankweiler testified that he interpreted both "picture" and "flower" to connote the drug sample. As a result of the calls, DEA agents set up surveillance at Samuels' residence. They saw Saldana and Zapata arrive at the house and later saw Saldana emerge from the garage and drive off with Zapata, who had been waiting in the car. Saldana then called Juan and told him that he had shown "my friend" "the photos" and was giving the other half to "the old man" – a reference to Zapata – "for him to show it to his friend, just in case."

About a week later, DEA agents executed federal search warrants at Samuels', Saldana's and Zapata's residences. They found twenty-six kilograms of cocaine in a storage bin in the trunk of Samuels' car in his garage. One kilogram was in a shoe box that had been sliced down the middle, with some of the cocaine missing, and the other twenty-five kilograms were stacked in bricks. Shankweiler testified that he believed the single kilogram was the sample that had been given to Samuels by Saldana, explaining that "it's not uncommon for somebody to provide a sample before making that type of investment." He estimated that the bin contained about $500,000 worth of cocaine.

The search of Saldana's residence turned up a small amount of cocaine and $68,980 in cash and, at Zapata's home, a safe containing $2,200 in cash and an electronic scale were seized. Zapata, Saldana and Samuels were arrested and a superseding indictment later charged Zapata and five co-defendants with participating in a drug trafficking conspiracy that extended from 2001 through August 2005.

**B. The Change of Plea**

Trial commenced against Zapata and Saldana on November 26, 2007, after the other four defendants had been convicted or pled guilty. On the day the jury was impaneled, Saldana pled guilty to a single count charging conspiracy to distribute five kilograms or more of cocaine. Later the same day, Zapata agreed to plead guilty to the criminal information charging unlawful use of a communication facility. See 21 U.S.C. § 843(b). In exchange, the government dismissed the drug conspiracy count against him in the superseding indictment.

At the arraignment on the new charge, the government summarized the evidence against Zapata as follows:

> [T]he evidence would prove that on July 4, 2005, at around 6:10 in the afternoon, the defendant engaged in a phone conversation with a person named Juan. He received a phone call from Juan in which Juan told Zapata that he was taking it easy and said, "Ask those guys if they're going to come over tonight because there are 55 . . . pesos there," to which Zapata replied, "No, we're going tomorrow. Tomorrow," to which Juan said, "Somebody

-8-

doesn't let you?" Zapata said, "No, because we're all drinking."

At that time Zapata put Sergio [Saldana], who is the defendant in this case, on the phone where they again talked about a conversation about 55 pesos. The evidence would show that 55 pesos, along with other conversations, was about $55,000 in drug proceeds for the prior transportation and sale of approximately 3 kilograms of cocaine in New York City days before.

Zapata acknowledged at the hearing that he knew his cell phone was being used to facilitate a drug transaction between Juan and Saldana, but denied knowledge of any quantity of drugs or drug proceeds discussed during the phone conversation. He stated that he "didn't know what those 55 pesos were about, that they called him [Saldana] on my phone and I passed it on to them."

In his sentencing memorandum and at his initial sentencing hearing, Zapata argued that his appropriate sentencing range under the guidelines was six to twelve months of imprisonment. That calculation began with the assumption that no quantity of drugs had been proven attributable to him, giving him a base offense level ("BOL") of 12.[5] The Probation Office concluded in the PSR, however, that Zapata was responsible for 3.1

---

[5] Under the Sentencing Guidelines, the base offense level for an offense under section 843(a) is the offense level for the crime that the defendant sought to facilitate. See U.S.S.G. § 2D1.6. The offense level for the underlying crime here – a drug conspiracy – is tied to the quantity of drugs attributable to the defendant's conduct. U.S.S.G. § 2D1.1. BOL 12 applies to a cocaine trafficking conspiracy when no amount of drugs has been proven. U.S.S.G. § 2D1.1(a), (c)(14).

kilograms of cocaine based on a "conservative estimate" of the drugs discussed in the July 4 phone call and other calls intercepted at around the same time, plus additional small amounts discussed in other calls. Relying on that drug weight, the PSR calculated an offense level of 28, ultimately resulting in a guideline range of 57 to 71 months.[6] Because section 843(b) provides for a statutory maximum of four years, the PSR noted that the guidelines sentence was 48 months.

**C. The Drug Quantity Hearing and District Court Ruling**

The district court conducted an evidentiary hearing on the issue of drug weight in April 2008. The only witness was Agent Shankweiler, and the government also introduced into evidence wiretap recordings and transcripts of English translations of intercepted conversations that had been conducted in Spanish. Shankweiler testified to his understanding of numerous phone conversations involving Zapata, Saldana and others – including those described above – and explained why he construed certain words to be coded references to drug transactions. In cross-examining Shankweiler about his understanding of the intercepted conversations, defense counsel challenged the agent's drug-related

---

[6] The calculation took into account a reduction in the BOL for acceptance of responsibility.

interpretations of the coded language and sought to show that the conversations were equally susceptible to lawful connotations.[7]

At the conclusion of testimony, the government argued that Zapata should be held responsible for at least one kilogram of cocaine based on the July phone calls and the evidence that he had received a portion of the sample given to Samuels on August 18. In response, defense counsel emphasized the absence of evidence that Zapata played a role beyond lending his phone to Saldana, and he further argued that no particular quantity of drugs was foreseeable to Zapata. Zapata was never seen with any drugs, and he remained in the car when Saldana dropped off the sample that investigators linked to the twenty-six kilograms later found in Samuels' garage. In addition, none of the intercepted conversations showed that Zapata knew Samuels. Counsel challenged the government's reliance on the coded language, highlighting, inter alia, that the same words were interpreted in different ways in different situations.[8]

---

[7] In one exchange, for example, defense counsel focused on Shankweiler's testimony that the box Zapata took from Saldana's residence and carried into Juan's apartment on July 7 contained drugs. The conversations on July 6 that preceded the delivery referred to a "radiator," and defense counsel challenged Shankweiler's belief that such references were code for drugs. Counsel sought to show that, given the legitimate car business run by Zapata, the references to "radiator" were more logically understood to describe a car part.

[8] Shankweiler interpreted specified numbers of pesos to refer to different multiples of dollars. For example, he construed "55 pesos" and "70 pesos" in the July 4 and 5 conversations to mean $55,000 and $70,000, but also testified that "4 pesos" meant $40,000. The PSR, meanwhile, construed a reference to 100 pesos to

Defense counsel argued that, consistent with the Sixth Amendment, the drug quantity needed to be proven beyond a reasonable doubt, but asserted that the evidence was insufficient to support a specific drug weight finding even if evaluated under a preponderance standard. Relying on the absence of evidence to show that Zapata should be held responsible for any particular weight, counsel reiterated the request for a BOL of 12, reduced for acceptance of responsibility to BOL 10, with the accompanying six-to-twelve-month sentencing range. Counsel recommended that the court impose a twelve-month term of probation.

The district court rejected the defense argument on the applicable standard of proof and found, by a preponderance of the evidence, that Zapata should be held accountable for between three and three-and-a-half kilograms of cocaine. Characterizing this amount as "a conservative estimate," the court focused on the July 4 phone calls that it believed showed Zapata to be "an active lieutenant to Mr. Saldana." The court observed:

> He receives the calls, he fields the calls, and then he puts Saldana on the line. And then he takes it upon himself to be protective of Saldana in the third call.[9] That's somebody

denote 100 grams of cocaine.

[9] The "third call" to which the court referred was Zapata's call to Juan on July 4, following the two calls from Juan in which he had passed the phone to Saldana. Zapata urged Juan to tell Saldana not to "go over there" until the next day "because he's drinking, you understand. . . . [It]'s hot, also." Later in the call, after asking Juan to "tell him anything, anything at all, so

-12-

who is clearly operating in concert with Saldana, in Saldana's interest, whatever they might be. He acts as sort of a gatekeeper with respect to Juan.

The court noted that the evidence generally showed that Saldana was selling kilogram quantities of cocaine and that, notwithstanding the "opaque" and sometimes inconsistent language in the calls, the "patterns of discussion" in the July 4 calls showed a pending transaction aimed at collecting payment for a prior deal and initiating a new one.

The court relied on the roughly $20,000-per-kilogram street price for cocaine and the "peso" references in the phone conversations, as interpreted by Shankweiler, to find the July 4 calls involved drug trafficking "in the range of three to three and a half kilos." The court concluded that Zapata was responsible for at least that amount, but noted that "a reasonable estimate could easily go higher by, for example, including August quantities." The court thus adopted the PSR calculation of a BOL of 28, which it reduced by three levels for acceptance of responsibility. The resulting guidelines range was 57 to 71 months.

The court then invited the parties to address the other sentencing factors that must be considered under 18 U.S.C.

that nothing bad happens there," he again explained, "[b]ecause it's hot, hot, you understand?"

§ 3553(a).[10] The government urged that the sentence be set at the statutory maximum based, inter alia, on the need for deterrence and the defendant's failure to fully accept responsibility for his actions. Defense counsel emphasized that Zapata should not be punished as if he were a participant in the drug conspiracy given that the conspiracy charge against him had been dropped, but only for the crime to which he pled guilty. Although he admitted facilitating a drug conspiracy involving Saldana and Juan, "he had no idea of quantities." Moreover, counsel argued, the evidence showed that the transaction that occurred on July 7 involved car parts, not drugs. In addition, given Zapata's age and personal circumstances, lack of criminal history, and the likelihood of deportation following whatever sentence he received, a twelve-month term of probation would be a reasonable and appropriate punishment.

The district court imposed the statutory maximum of 48 months. It explained that the distribution of kilogram quantities of cocaine, even if done in a single episode, is "a serious offense that the community suffers from and that the community, therefore, requires an expression of punishment and justice for." The court concluded that the circumstances did not warrant reducing the

---

[10] Those factors include, inter alia, the history and characteristics of the defendant, the seriousness of the offense, the goals of rehabilitation, and the need for deterrence. See 18 U.S.C. § 3553(a).

-14-

sentence below the statutory maximum, which was less than the guidelines range of 57 to 71 months.

On appeal, Zapata asserts four errors: (1) the sentence violated his Sixth Amendment rights because it was based on facts that he did not admit and that were not found by a jury beyond a reasonable doubt; (2) the judge's finding of drug quantity was not supported by sufficient evidence; (3) the district court committed procedural error by relying solely on the guidelines in setting the sentence, disregarding the other factors listed in 18 U.S.C. § 3553(a); and (4) the sentence was unreasonable in light of his individual characteristics. We consider each contention in turn.

## II.

Zapata argues that his sentence violated the Sixth Amendment because it was based on a drug quantity that the court determined by a preponderance of the evidence. He contends that, under Blakely v. Washington, 542 U.S. 296 (2004), as clarified in Cunningham v. California, 549 U.S. 270 (2007), a sentencing judge may not exceed the statutory maximum term of imprisonment that applies "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 542 U.S. at 303 (emphasis omitted). Zapata emphasizes language in Cunningham highlighting the statement in Blakely that "'[t]he relevant "statutory maximum" . . . is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may

impose <u>without</u> any additional findings.'"  549 U.S. at 275 (quoting <u>Blakely</u>, 542 U.S. at 303-04).

We have repeatedly held that, "under the advisory Guidelines, judicial fact-finding on drug quantity is constitutionally permissible," within the limits set by <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000).  <u>United States</u> v. <u>Arango</u>, 508 F.3d 34, 42 (1st Cir. 2007).  <u>Apprendi</u> holds that facts that increase the penalty for a crime "beyond the prescribed statutory maximum," other than the fact of a prior conviction, must be proved beyond a reasonable doubt to a jury.  <u>See</u> 530 U.S. at 490.  Consistent with that directive, we have routinely upheld sentences that relied on drug quantities found by a preponderance of the evidence where the term imposed fell within the maximum for the statute of conviction.  <u>See</u> <u>United States</u> v. <u>Platte</u>, 577 F.3d 387, 392 (1st Cir. 2009).

Zapata argues that the Supreme Court in <u>Cunningham</u> clarified that <u>Apprendi</u> and its progeny bar the use of judge-found facts "to increase federal sentences beyond the highest sentence that would be 'reasonable' absent the judicial fact-finding."  He asserts that the "true statutory maximum" is thus not the term set by Congress as the upper limit for a type of crime, but the highest sentence that would survive scrutiny for substantive reasonableness in the particular case based solely on jury-found or admitted facts.

In this case, therefore, Zapata argues that the maximum sentence set by statute for a violation of 21 U.S.C. § 843(b) – 48 months – is not the relevant marker.  He contends that, to determine the maximum applicable to him, we must look first to the guidelines sentencing range that is authorized based exclusively on the facts that he admitted, i.e., that he facilitated a friend's drug conspiracy by allowing him to use his phone.  Without a finding on the amount of drugs involved in the conspiracy, that range would be six to twelve months.  See U.S.S.G. §§ 2D1.6, 2D1.1(c)(14).  Zapata argues that a higher range would apply only if he had admitted, or a jury had found, that he was responsible for a specific quantity of cocaine.  Under Zapata's view of the law, the sentencing court may find facts to determine his appropriate sentence within the authorized range, but it may not go above twelve months because, under Cunningham, that is "'the maximum [the court] may impose without any additional findings.'" 549 U.S. at 275 (emphasis omitted) (quoting Blakely, 542 U.S. at 303-04).[11]  He maintains that a higher sentence, in the absence of

---

[11] Zapata does not view the guideline range produced in this way as mandatory or conclusive, but, consistent with the Booker line of cases, merely as a starting point for the sentencing determination.  See United States v. Booker, 543 U.S. 220 (2005). The sentencing judge would be obliged to evaluate this "true reasonable maximum dictated by the Guidelines" in light of "real world sentences that have been meted out for the same crime." He asserts that data compiled by the U.S. Sentencing Commission concerning sentences under section 843(b) for defendants in similar circumstances confirms that his "true statutory maximum was no more than twelve months."

additional facts, would be unreasonable and, hence, unlawful. See generally Rita v. United States, 551 U.S. 338, 354 (2007) (noting that circuit courts "exist to correct" erroneous sentences that are unreasonable); United States v. Booker, 543 U.S. 220, 260-62 (2005) (noting that sentences are reviewed for substantive reasonableness).

We are unpersuaded that Cunningham gives us reason to revisit our longstanding approach to judicial fact-finding on drug quantity. As Zapata acknowledges, Cunningham involved a mandatory, determinate sentencing scheme unlike the advisory guidelines that emerged from Booker, and it therefore triggers different constitutional concerns. See Cunningham, 549 U.S. at 285 & n.10 (noting Booker's holding that use of advisory sentencing provisions "would not implicate the Sixth Amendment"); id. at 292 ("California's [system] does not resemble the advisory system the Booker Court had in view."). Indeed, we have recently rejected a contention that Cunningham changed the landscape for determining drug quantity under the federal guidelines, holding that "our case law remains clear that judges may find facts to establish the guideline range within the applicable statutory maximum." United States v. Correy, 570 F.3d 373, 377 (1st Cir. 2009). Such an approach transgresses neither the Sixth Amendment nor the ultimate objective of a reasonable sentence. We see nothing unreasonable in a sentence that is based on the scope of a defendant's crime as

-18-

supportably found by the district court and, so long as the sentence remains within the bounds set by Congress, no constitutional violation occurs. Other courts have reached similar conclusions. See, e.g., United States v. Mayberry, 540 F.3d 506, 516-17 (6th Cir. 2008) (holding that Cunningham does not prevent sentencing judges "from informing their sentencing by finding facts by a preponderance of the evidence . . . so long as the sentence does not exceed the statutory maximum"); United States v. Roti, 484 F.3d 934, 937 (7th Cir. 2007) ("District judges remain free . . . to make findings of fact that influence sentences, provided that the sentence is constrained by the maximum set by statute for each crime."); United States v. Grier, 475 F.3d 556, 562-66 & n.6 (3d Cir. 2007) (en banc) (similar, addressing a Fifth Amendment challenge).

As the sentence in this case did not exceed the statutory maximum set by Congress, it fell within constitutional limits.

**III.**

Zapata argues that, even under a preponderance standard, the evidence presented at the sentencing hearing was insufficient to support the district court's finding that he was responsible for up to 3.5 kilograms of cocaine. As described above, the court based its calculation primarily on Agent Shankweiler's interpretation of the references to fifty-five and seventy pesos in Juan's conversations with Zapata and Saldana on July 4 and 5, 2005,

-19-

as well as on the undisputed $20,000-per-kilogram street price for cocaine.  At $20,000 per kilogram, "seventy pesos" would reflect payment for 3.5 kilograms.

The district court's determination of the drug quantity attributable to Zapata is reviewed for clear error.  Platte, 577 F.3d at 392; United States v. Ventura, 353 F.3d 84, 87 (1st Cir. 2003).  The court "possesses broad discretion in determining whether evidence is sufficiently reliable for sentencing purposes," United States v. Green, 426 F.3d 64, 66 (1st Cir. 2005) (internal quotation marks omitted), and "drug-quantity estimations need not be statistically or scientifically precise," United States v. Scalia, 993 F.2d 984, 989 (1st Cir. 1993).  The sentencing court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3(a).

In challenging the district court's finding, Zapata emphasizes that no cocaine was ever found on his person or in his home, and neither he nor his co-defendants were observed handling cocaine around the time of the July calls.  Zapata points out that Shankweiler admitted that the box he delivered on July 7 to Saldana's mother's building in New York – which Shankweiler believed contained drugs – could have held a radiator or clothing. Zapata faults the district court for relying on Shankweiler's

interpretation of code words used in the phone calls, noting that Shankweiler had no special training or inside information to support his interpretations of the code and that the interpretations contained "numerous internal inconsistencies."

Although the evidence was not perfect, it was sufficient to support the district court's drug quantity finding. Shankweiler was an experienced narcotics agent who had been the case agent on six wiretap investigations by the time of the evidentiary hearing and had reviewed thousands of calls in this investigation, giving his testimony "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); see United States v. Villarman-Oviedo, 325 F.3d 1, 12-13 (1st Cir. 2003) (concluding that agent was "clearly qualified by experience and the 'specialized knowledge' that he had acquired over the years to opine on the meaning of the code words"); United States v. Ceballos, 302 F.3d 679, 688 (7th Cir. 2002) (endorsing use of narcotics investigators' testimony on ambiguous words in recorded conversations because they had "vast experience with drug code language"). Moreover, the district court had before it the transcripts of numerous phone calls, from which it could evaluate the plausibility and reliability of Shankweiler's testimony.[12]

---

[12] Zapata argues that Villarman-Oviedo is inapt precedent because a cooperating witness and the defendant in that case admitted that code words were used in their drug transactions and that Ceballos is distinguishable because the court permitted agent testimony on the meaning of ambiguous pronouns rather than on

-21-

The court acknowledged the inconsistency in Shankweiler's interpretations of "pesos," but concluded that the specific meaning at any particular time was not crucial to its assessment of "the patterns of discussion." In discounting the shifting meanings, the court reasonably could credit Shankweiler's testimony that he had heard the word "pesos" used on "numerous intercepts and drug calls to mean both cocaine or drugs and money," and that it could change in usage within a single investigation. The court considered it significant that, in the July conversations, Zapata was "dealing in code on behalf of somebody who is objectively known to be a drug dealer" and who was "selling kilo quantities of cocaine."

In addition to evidence on the specific drug quantity linked to the July phone calls, the district court had ample evidence that Zapata was actively involved in the conspiracy with Saldana, reinforcing the likelihood that he was a knowledgeable participant in the transaction he admitted facilitating. The phone calls with Juan showed an ongoing interaction among the three men and a role for Zapata beyond lending his phone on one occasion.

---

unambiguous nouns. Neither distinction undermines the district court's reliance on Shankweiler's expertise in the context of this case. As noted, the court was able to evaluate Shankweiler's conclusions in light of the transcripts and could draw its own conclusion about whether – as Shankweiler testified – the coded language "sticks out in the context of the call because it doesn't fit." Moreover, the agents in Ceballos also testified that words such as "tickets" and "cars" were code words for narcotics and that "one" and "two" referred to certain quantities of methamphetamine, see 302 F.3d at 686, and Ceballos is thus not distinguishable as defendant suggests.

Zapata was with Saldana multiple times when drug-related events and conversations took place, including when Saldana spoke with Juan about giving a sample of cocaine to Samuels and when that sample apparently was delivered on August 18.

Given Shankweiler's testimony and the transcripts of the phone calls, the district court's drug quantity estimate represents a reasonable view of the record. It is therefore not clearly erroneous. See, e.g., United States v. Ortiz-Torres, 449 F.3d 61, 79 (1st Cir. 2006).

**IV.**

Zapata also argues that his sentence was procedurally flawed because the district court failed to consider all of the sentencing factors set forth in 18 U.S.C. § 3553(a) and substantively flawed because it was greater than necessary to comply with the purposes of that provision.[13] We review the substantive reasonableness of a sentence for abuse of discretion

---

[13] Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Paragraph (2) lists the following purposes:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

-23-

after considering whether the district court committed a significant procedural error.  See Gall v. United States, 552 U.S. 38, 41, 51 (2007); Stone, 575 F.3d at 88.  If the court followed the correct procedure, the sentence will be upheld unless it "falls outside the expansive boundaries" of the universe of reasonable sentences.  United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008).

## A.  The Procedural Claim

In imposing sentence, a district court is expected first to calculate the defendant's guidelines range and then to consider whether a guideline sentence is appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).  United States v. Bunchan, 580 F.3d 66, 72 (1st Cir. 2009).  Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to provide deterrence, respect for the law and just punishment, and the need "to avoid unwarranted sentence disparities."  18 U.S.C. § 3553(a)(1), (2), (6).  Zapata argues that the district court "disregarded all sentencing factors other than the Guidelines and thereby abused its discretion and deprived Mr. Zapata of the individualized sentencing treatment to which he is entitled."

The record does not support this contention.  After determining the guidelines range, the district court invited the parties to address the other 3553(a) factors and to make specific

-24-

sentencing recommendations. The government argued for a term of imprisonment of 48 months, the statutory maximum, after noting the large scale of the drug conspiracy, the need for deterrence, and Zapata's failure to fully accept responsibility for what he did. Defense counsel urged a sentence of twelve months probation, pointing out that Zapata's acceptance of responsibility should not focus on the conspiracy crime that the government had agreed to dismiss. Counsel emphasized that Zapata had admitted awareness of Saldana's involvement in drug transactions, but he "had no idea of amounts." Counsel also cited Zapata's likely deportation, his age, his health, his role as a devoted father and grandfather, and his lack of a criminal record in urging the court to find that a prison term was unnecessary.

The court, in turn, specifically referred to some of the 3553(a) factors in explaining why it believed the guidelines sentence appropriately took them into account. It noted, inter alia, that "the distribution of kilogram quantities . . . is a serious offense that the community suffers from and that the community, therefore, requires an expression of punishment and justice from." The court then considered whether, given the guidelines range of 57 to 70 months and the statutory maximum of 48 months, "a sentence less than 48 [is] called for in the circumstances of the case." It concluded that it was not: "[T]aking all of the facts into account, . . . a sentence at the

high end of the statutory range is an appropriate sentence for the criminal conduct admitted to in the information."

Although the court did not explicitly discuss the personal characteristics of the defendant that were highlighted by defense counsel, that does not mean it failed to consider them. The court noted that it needed to evaluate the guideline calculation and statutory maximum in "the circumstances of the case," and, given the arguments the court had just heard, it is apparent that Zapata's personal characteristics and history were among "the facts" it took into account. To be sure, it would have been better if the court had given explicit attention to at least some of the personal factors, eliminating an appellate issue. See United States v. García-Carrasquillo, 483 F.3d 124, 134 n.15 (1st Cir. 2007) (noting that "district court judges would do well to make the sentencing process as transparent as possible, to avoid the possibility of remand on appeal"); United States v. Scherrer, 444 F.3d 91, 97 (1st Cir. 2006) (en banc) (Lipez, J., concurring) ("[W]hen the defendant or the government advances specific arguments for leniency or severity, grounded in the defendant's history or the circumstances of the offense, it is reasonable to expect a district court to explain why those specific arguments are or are not persuasive."). A sentencing court is not obliged, however, to specifically address all of the section 3553(a) factors in its explanation, nor to give each of the factors "equal

prominence" in its determination. <u>United States</u> v. <u>Dixon</u>, 449 F.3d 194, 205 (1st Cir. 2006); <u>see</u> <u>also</u> <u>United States</u> v. <u>Pulido</u>, 566 F.3d 52, 64 (1st Cir. 2009). Here, we are satisfied from the court's limited explanation that it considered all of the applicable factors and viewed the reduction in sentence from the guidelines range to the statutory maximum of 48 months as sufficient to account for the defendant's individual circumstances.

In sum, the record shows no procedural error in Zapata's sentencing.

## B. Substantive Reasonableness

Zapata also argues that his four-year sentence is unreasonable because, in his circumstances, it violates the requirement under section 3553(a) that the sentence be "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). He reiterates the arguments made to the district court on each of the 3553(a) factors, arguing, inter alia, that his advanced age, "spotless prior record," family responsibilities, ignorance of the amount of cocaine, acceptance of responsibility and likely deportation, along with the relatively minor nature of the "telephone offense," render probation a just and adequate punishment and the four-year term unreasonably harsh. He points to statistics indicating that the mean sentence length for similarly situated defendants who violated section 843(b) is substantially less than 48 months, and he further asserts that

incarceration is unnecessary to protect the public or achieve rehabilitation, as proven by his full compliance with his conditions of release while awaiting trial and sentencing.

To some extent, Zapata's reasonableness argument relies on a view of his crime at odds with the district court's supportable finding that, as "an active lieutenant to Mr. Saldana," he facilitated a drug transaction involving three or more kilograms of cocaine. To the extent Zapata emphasizes his otherwise unblemished record and personal circumstances, his arguments for sentencing leniency may be well-founded, but they are ultimately unavailing. The court's decision to emphasize the nature of the crime over the mitigating factors was a "'choice of emphasis'" that is "'not a basis for a founded claim of sentencing error.'" United States v. Rodríguez, 525 F.3d 85, 110 (1st Cir. 2008) (quoting United States v. Deppe, 509 F.3d 54, 62 (1st Cir. 2007)). District courts have wide latitude in sentencing, and we cannot say that the result in these circumstances – a sentence below the applicable guidelines range – was indefensible. See Martin, 520 F.3d at 92 (describing the sentencing inquiry as "broad, open-ended, and significantly discretionary"); id. at 96 ("[T]he linchpin of a reasonable sentence is a plausible sentencing rationale and a defensible result.").

Having found no basis for disturbing the sentence imposed by the district court, we affirm its judgment.

<u>So ordered</u>.